CNC/Access, Inc. v. Scruggs, 2006 NCBC 20

STATE OF NORTH CAROLINA

COUNTY OF BURKE

CNC/ACCESS, INC.,

        Plaintiff,

v.

VICKIE SCRUGGS, RICHARD GREER
and UNIVERSAL MENTAL HEALTH
SERVICES, INC.,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
04 CVS 1490

)
)
)
)
)
)
)
)
)
)
)
)
)

ORDER AND OPINION

{1}     This matter comes before the Court on cross motions by Plaintiff and Defendants for summary judgment.  Defendants move for summary judgment on Plaintiff's claims for breach of contract, breach of fiduciary duty, misappropriation of trade secrets, tortious interference with contract and/or prospective economic advantage, breach of covenant not to compete, breach of covenant not to disclose confidential information, and unfair trade practices.  Plaintiff moves for summary judgment on Defendants' counterclaims for defamation, malicious prosecution, unfair trade practices, and tortious interference with prospective economic advantage.

{2}     After considering the briefs of each party and for the reasons below, the Court (1) GRANTS Defendants' motion for summary judgment as to Plaintiff's breach of contract claim against Scruggs, (2) DENIES Defendants' motion for summary judgment as to Plaintiff's misappropriation of trade secrets claim to the extent it is based on the alleged use of the fifty-seven policies and forms contained in Defendants' Deposition Exhibit 29, (3) GRANTS Defendants' motion for summary judgment as to Plaintiff's tortious interference with contract and/or prospective economic advantage claims, (4) GRANTS Defendants' motion for summary judgment as to Plaintiff's breach of covenant not to compete claim against Scruggs, (5) DENIES Defendants' motion for summary judgment as to Plaintiff's claim for breach of covenant not to disclose confidential information to the extent it is based on the alleged use of the fifty-seven policies and forms contained in Defendants' Deposition Exhibit 29, (6) DENIES Defendants' motion for summary judgment as to Plaintiff's unfair trade practices claim to the extent it is based on the alleged use of the fifty-seven policies and forms contained in Defendants' Deposition Exhibit 29, (7) DENIES Plaintiff's motions for summary judgment as to Defendants' counterclaims for defamation, (8) DENIES Plaintiff's motions for summary judgment as to Defendants' counterclaims for unfair trade practices to the extent they are based on Defendants' counterclaims for defamation, and (9) DENIES Plaintiff's motion for summary judgment as to Defendants Greer and Universal's counterclaim for tortious interference with prospective economic advantage.

Tennille, Judge.

*The Edmisten & Webb Law Firm by William Woodward Webb and William Woodward Webb, Jr. for Plaintiff.*

*Moore & Van Allen PLLC by Karin M. McGinnis and Michael T. Champion; Sarah J. Kromer PLLC by Sarah J. Kromer for Defendants Richard Greer and Universal Mental Health Services, Inc.*

*Marshall & Roth, PC by Philip J. Roth, Jr. for Defendant Vickie Scruggs.*

## I.
## PROCEDURAL BACKGROUND

{3} This action was filed in Burke County Superior Court on September 24, 2004. The case was designated "exceptional" under Rule 2.1 of the North Carolina General Rules of Practice for the Superior and District Courts and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Justice of the Supreme Court of North Carolina dated January 31, 2005.

{4} Plaintiff and Defendants filed cross motions for summary judgment on April 21, 2006.

## II.
## FACTUAL BACKGROUND
## A.
## THE PARTIES

{5} Plaintiff CNC/Access, Inc. ("CNC/Access" or "CNC") is a corporation organized and existing under the laws of the State of Rhode Island, with its principal place of business in Burke County, North Carolina.

{6} Defendant Vickie Scruggs is a citizen and resident of Burke County, North Carolina.

{7} Defendant Richard Greer is a citizen and resident of Caldwell County, North Carolina.

{8} Defendant Universal Mental Health Services, Inc. ("Universal") is a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business in Caldwell County, North Carolina.

## B.
## OVERVIEW OF THE FACTS

{9} CNC/Access was originally founded as Communication Network Consultants, Inc. in 1986 by Defendant Richard Greer. In 1997, it became a subsidiary of ResCare, Inc., a publicly traded company with national reach. In 2003, following the sale of CNC/Access and expiration of his covenant not to compete, Greer formed Defendant Universal.

{10} Each of these companies provides various services and treatment for persons with mental health issues, developmental disabilities, and substance abuse problems. This field is accordingly known as "MH/DD/SA." For the past three decades, North Carolina has engaged in a gradual privatization of the MH/DD/SA industry. At present, a system of local management entities ("LMEs") oversees the provision of services to individual consumers. LMEs contract with private sector providers such as CNC/Access and

Universal to deliver services; providers do not enter into contracts with individual consumers. The LME determines what services a consumer will require, and then identifies the providers authorized to furnish such services. The choice of provider rests with the consumer. After the consumer has chosen a provider, the LME is responsible for monitoring the delivery of services.

{11} The actual provision of services is handled by a member of the provider's direct care staff ("DCS") and supervised by a qualified professional, or "Q." The DCS works with the consumer on a regular basis, and a close relationship often develops between them. If the DCS leaves the employ of one provider for another, the consumer may elect to follow. This is particularly relevant in light of the industry's high rate of employee turnover. Plaintiff has experienced a turnover rate of fifty to sixty percent in recent years.

C.

SCRUGGS'S COVENANT NOT TO COMPETE

{12} Defendant Vickie Scruggs commenced employment as a "Q" with CNC/Access on September 12, 1996. At that time, she entered into an employment agreement with CNC/Access that contained the following covenant not to compete:

> [D]uring the time this Employment Agreement is in effect and for a period of three (3) years thereafter, the Employee shall not, directly or indirectly, individually or as an employee, partner, officer, director or stockholder or in any other capacity whatsoever of any person, firm, partnership or corporation, compete with the Company within the State of North Carolina.

(Scruggs Employment Agreement § 6.A., Compl. Ex. 1.) Scruggs worked for CNC/Access until September 15, 2003, when she tendered her resignation. She began working for Defendant Universal immediately thereafter.

{13} Plaintiff claims Scruggs breached both her Employment Agreement and the covenant not to compete by commencing employment with Universal less than three years after leaving her CNC/Access position. Defendants argue the covenant not to compete is unenforceable because it violates public policy and is overbroad in time, territory, and scope.

D.

CNC'S COMMUNICATIONS TO THIRD PARTIES

{14} After Scruggs left CNC's employ for Universal, CNC initiated a number of communications with third parties regarding Scruggs, Greer, and Universal. In September of 2003, CNC contacted the Foothills LME and lodged a complaint stating that Scruggs had coerced clients into leaving CNC in breach of confidentiality obligations. Foothills personnel conducted an investigation, found no evidence of wrongdoing, and dropped the complaint. CNC eventually filed another complaint with Foothills that was also dropped following investigation.

{15} On October 9, 2003, CNC filed a complaint with the Office of Civil Rights at the United States Department of Health and Human Services. The complaint was ultimately dismissed.

{16} On October 21, 2003, CNC filed a complaint against Scruggs with the North Carolina Health Care Personnel Registry ("NCHCPR") accusing Scruggs of fraud.

{17} On October 22, 2003, CNC contacted the Western Highlands LME and informed personnel

there that Universal was taking CNC's clients in the Foothills LME area. Western Highlands conducted an investigation and concluded that there had been no wrongdoing on the part of Universal.

{18} On February 23, 2004, CNC submitted a complaint to the North Carolina Board of Licensed Professional Counselors against former employee James Revels, who had gone to work for Universal.

{19} On August 24, 2004, CNC filed an ethics charge against Universal with the North Carolina Community Support Providers' Council ("Providers' Council").

{20} In addition to these communications with various government and other entities, CNC communicated its thoughts on Scruggs, Greer, and Universal with employees departing for Universal.

E.

UNIVERSAL'S USE OF CNC/ACCESS DOCUMENTS

{21} CNC/Access alleges that Universal improperly used a number of CNC policies and forms. After Richard Greer left CNC in 1999, he became involved with a finance company unrelated to the MH/DD/SA industry. Richard Greer's son, Robert Greer, eventually became president of this finance company. Steve Greer (brother of Richard Greer) was CNC's Human Resources Director at the time, and gave Robert copies of some CNC personnel policies for the finance company's use in preparing its human resources manual.

{22} Richard Greer formed Universal in 2003 with the help of his son Robert and daughter Alicia. Universal's first employee, Hope Orren, was charged with preparing Universal's human resources policies, procedures, and forms. Defendants do not dispute that Ms. Orren based some of her work on some of the personnel policies given to Robert Greer by CNC Human Resources Director Steve Greer when Robert was working at the finance company.

{23} CNC's claims of misappropriation of trade secrets, unfair and deceptive trade practices, and breach of contract rest upon these facts.

III.

MOTIONS FOR SUMMARY JUDGMENT

A.

LEGAL STANDARD

{24} A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no issue as to any material fact" and that the party "is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). The burden of showing a lack of triable issues of fact falls upon the moving party. *See, e.g.*, *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985). Once this burden has been met, the nonmoving party must "produce a forecast of evidence demonstrating that [it] will be able to make out at least a prima facie case at trial." *Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989).

{25} The Court must exercise caution is granting a motion for summary judgment. A slight doubt as to the merits of the motion is sufficient to result in denial. *First Fed. Savings & Loan Ass'n v. Branch Banking & Trust Co.*, 282 N.C. 44, 50, 191 S.E.2d 683, 688 (1972).

B.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

{26} In its Complaint, Plaintiff seeks relief for the following: (1) breach of contract (against Scruggs), (2) breach of fiduciary duty, (3) misappropriation of trade secrets, (4) tortious interference with contract and/or prospective economic advantage, (5) breach of covenant not to compete (against Scruggs), (6) breach of covenant not to disclose confidential information (against Greer), and (7) unfair trade practices. Defendants have moved for dismissal of all claims on summary judgment. The Court will address each claim in turn.

1.

## BREACH OF CONTRACT AGAINST SCRUGGS

{27} CNC alleges that Scruggs breached her 1996 Employment Agreement ("Agreement") by (1) disclosing CNC trade secrets and confidential information, (2) violating section 2.B of the Agreement by contacting CNC clients and employees during her employment to encourage them to transfer to Universal, and (3) competing with CNC within three years of her termination in violation of section 6.A of the Agreement.

{28} As to the first alleged breach, there is no evidence that Scruggs misappropriated trade secrets other than CNC's assertion that Universal was in possession of or copied CNC human resources documents. The evidence indicates that these documents found their way to Universal by way of the Greers, not Scruggs.

{29} As to the second alleged breach, CNC has presented no evidence that Scruggs violated section 2.B of the Agreement, which states as follows:

> [D]uring and throughout the terms of this Employment Agreement, [Scruggs] will devote to the business her full time and efforts necessary for the performance of the duties and responsibilities to be performed by her under the terms of this Employment Agreement, and that during such time she will not undertake any activities, business or otherwise, that would unreasonably or materially interfere with or limit the complete carrying out, fulfillment or performance of her duties and responsibilities hereunder.

(Scruggs Employment Agreement § 2.B, Compl. Ex. 1.) CNC has presented no evidence to indicate that Scruggs solicited either employees or clients to leave for Universal while she was still employed with CNC.

{30} Third, Scruggs did not breach the Agreement by competing with CNC within three years of her resignation because the covenant not to compete found in section 6.A. of the Agreement is invalid and unenforceable under North Carolina law. The analysis leading to this conclusion is set forth in section III.B.5 below.

{31} For these reasons, the Court finds there is no genuine issue as to any material fact regarding Scruggs's alleged breach of contract. Therefore, Defendants' motion for summary judgment as to this claim is granted.

2.

## BREACH OF FIDUCIARY DUTY

{32} By Notice of Voluntary Dismissal filed May 22, 2006, Plaintiff voluntarily dismissed its claim for breach of fiduciary duty, thereby rendering moot Defendants' motion for summary judgment on that claim.

3.

## MISAPPROPRIATION OF TRADE SECRETS

{33}    CNC claims that Universal's use of certain policies and forms is a misappropriation of trade secrets under the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152–66-157 (LEXIS through 2006 legislation).  A "trade secret" is defined as follows:

> [B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3)(a)–(b).  The statute defines "misappropriation" of a trade secret as "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent." *Id*. § 66-152(1).  A party may seek damages for misappropriation of a trade secret. *Id*. § 66-154(b)–(c).

{34}    In this case, the evidentiary forecast presents a genuine issue of material fact as to whether certain CNC policies and forms were "trade secrets" worthy of the statute's protection.  As noted in section III.B.7 below, there were certain documents which Universal copied that would not have been publicly available.  Thus, Defendants' motion for summary judgment as to Plaintiff's claim of misappropriation of trade secrets is denied.

4.

## TORTIOUS INTERFERENCE WITH CONTRACT AND/OR PROSPECTIVE ECONOMIC ADVANTAGE

{35}   To establish a claim for tortious interference with contract, a plaintiff must show:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)

{36}    Plaintiff claims that Defendants interfered with CNC's relationships and contracts by, among other things, inducing CNC employees and clients to terminate existing relationships and contracts with CNC.  The contracts between CNC and its employees that Defendants allegedly interfered with were covenants not to compete signed by all CNC employees which provided as follows:  "for a period of one hundred eighty (180) days after my employment with CNC, Inc. ceases, I may not provide services to a client of CNC, Inc., either directly or through any other service provider."  (Employment Agreement, Compl. Ex. 3.)  Based on the principles described in section III.B.V below, these 180-day covenants are invalid and unenforceable.

{37}   The 180-day covenant is overbroad in its scope because it restricts the former CNC employees from providing services to *any* client, regardless of whether the employee actually provided services to that client during their time at CNC.  This is in violation of the principle stated in *Farr Associates v. Baskin*, 138 N.C. App 276, 530 S.E.2d 878 (2000), that "[a] client-based limitation cannot extend beyond contacts made during the period of the employee's employment."  *Id.* at 276, 530 S.E.2d at 883.

{38}   Since the 180-day covenants are invalid, a claim for tortious interference with them must also fail.

{39}   Plaintiff also asserts its tortious interference claim with regard to contracts between CNC and its clients.  However, CNC is a provider and does not have contracts with its clients.  As explained above, the contract exists between the LME and the client.  Since CNC cannot identify a contract that its clients were induced not to perform, its claim for tortious interference must fail on this ground as well.  Thus, Defendants' motion for summary judgment on Plaintiff's tortious interference with contract claim is granted.

{40}   As to the claim for tortious interference with prospective economic advantage, Plaintiffs must show that Defendants "induced a third party to refrain from entering into a contract with Plaintiff without justification.  Additionally, Plaintiff must show that the contract would have ensued but for Defendants' interference.  *DaimlerChrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002).

{41}   As this claim pertains to potential clients of CNC, it fails for the same reason as the claim for tortious interference with contract.  Since CNC does not have contracts with its clients, there can be no action for interference with prospective client contracts.  As to the CNC employees, the record reflects no instance in which any of the Defendants prevented an employee from entering into an agreement with CNC.  For these reasons, Defendants' motion for summary judgment on Plaintiff's tortious interference with prospective economic advantage claim is granted.

5.

BREACH OF COVENANT NOT TO COMPETE

{42}   As the courts of this State have observed repeatedly for more than sixty years, "[c]ovenants not to compete between an employer and an employee are 'not viewed favorably in modern law.'"  *Farr*, 138 N.C. App. at 279, 530 S.E.2d at 881, *quoting Hartman v. W.H. Odell & Assocs.*, 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994); *see also Safety Equip. Sales & Serv., Inc. v. Williams*, 22 N.C. App. 410, 414, 206 S.E.2d 745, 748 (1974); *Kadis v. Britt*, 224 N.C. 154, 158, 29 S.E.2d 543, 545 (1944).  When analyzing such restrictive covenants, the judiciary balances the employer's interest "in a workable employer-employee relationship" with the public's interest in "individual economic freedom, free dissemination of ideas, and reallocation or labor to areas of greatest productivity."  *See* 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 5.3 (2d ed. 1998).

{43}   To be enforceable in North Carolina, a covenant not to compete must be: "(1) in writing; (2) reasonable as to time and territory; (3) made a part of the employment contract; (4) based on valuable consideration; and (5) designed to protect a legitimate business interest of the employer."  *Hartman*, 117 N.C. App. at 311, 450 S.E.2d at 916.  Several cases further state that the covenant cannot be "against public policy."  *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 526, 379 S.E.2d 824, 826 (1989); *see also AEP Indus., Inc. v. McClure*, 308 N.C. 393, 402–03, 302 S.E.2d 754, 760 (1983).  A restrictive covenant which satisfies these requirements is reasonable and will be enforced by the courts.  The burden

of proving reasonableness falls upon the party who seeks to enforce the covenant. *See, e.g.*, *Hartman*, 117 N.C. App. at 311, 450 S.E.2d at 916; *Harwell Ent. v. Heim*, 6 N.C. App. 548, 552, 170 S.E.2d 540, 543 (1969); *Kadis*, 224 N.C. at 158, 29 S.E.2d at 545. "The reasonableness of a noncompetition covenant is a matter of law for the court to decide." *Beasley v. Banks*, 90 N.C. App. 458, 460, 368 S.E.2d 885, 886 (1988), *citing Shute v. Heath*, 131 N.C. 281, 282, 42 S.E.2d 704 (1902).

{44} Applying this multifactor analysis to the facts of this case, factors (1), (3), and (4) present no bar to the enforceability of the covenant not to compete in Ms. Scruggs's employment agreement. Documents submitted to this Court are sufficient to prove that the covenant was in writing and part of Scruggs's employment agreement with CNC/Access. (*See* Compl. Ex. 1.) The requirement of valuable consideration is also met. The Court of Appeals has previously found that "the promise of new employment is valuable consideration in support of a covenant not compete." *Farr*, 138 N.C. App. at 279, 530 S.E.2d at 881; *see also Milner Airco, Inc. v. Morris*, 111 N.C. App. 866, 869, 433 S.E.2d 811, 813 (1993). Here, Scruggs entered into an employment agreement containing the covenant not to compete in consideration for her new position with CNC/Access on September 12, 1996. CNC's promise of new job was therefore valuable consideration.

{45} The true issues arise with respect to the other factors. Turning first to the reasonableness of the time and territory restrictions, the cases make clear that there are no broadly applicable benchmarks to follow. Rather, the Court's inquiry must be highly fact-specific. North Carolina courts have upheld nationwide restrictions, *see Enterprises, Inc. v. Heim*, 276 N.C. 475, 481, 173 S.E.2d 316, 320 (1970), while striking down regional restrictions, *see VisionAIR, Inc. v. James*, 167 N.C. App. 504, 509, 606 S.E.2d 359, 363 (2004). These inconsistent results are entirely proper because the requirements of time and territory are related, and must be considered "in tandem." *See, e.g.*, *Farr*, 138 N.C. App. at 280, 530 S.E.2d at 881. The Court of Appeals has explained that "[a]lthough either the time or the territory restriction, standing alone, may be reasonable, the *combined effect* of the two may be unreasonable. A longer period of time is acceptable where the geographic restriction is relatively small, and vice versa." *Id.*

{46} In spite of the dependent relationship between time and territory, there is little tolerance for time restrictions of five years or more. Indeed, "[a] five year time restriction is the outer boundary which our courts have considered reasonable, and even so, five-year restrictions are not favored." *See, e.g.*, *id.* The time restriction in Ms. Scruggs's cases was three years, and did not approach the treacherous five year boundary. However, the facts demonstrate that a three-year restriction was unreasonable given the business context in which this case arose. First, CNC/Access representatives indicated in deposition testimony that a consumer who stays with the company for two years is considered "long-term." (CNC Dep. 265–66.) Second, employee turnover in the industry was extraordinarily high. With patients and caregivers cycling through the system at such a rapid pace, a three year restriction seems longer than reasonably necessary to protect CNC/Access.

{47} The Court must consider the three year time restriction along with the geographic restriction. In order to be considered reasonable, the territorial reach of a covenant not to compete must be no broader than is necessary to maintain an employer's present customer relationships. *See, e.g.*, *Farr*, 138 N.C. App. at 281, 530 S.E.2d at 882. "The employer must show that the territory embraced by the covenant is not more than necessary to secure the protection of its business or good will." *Id.* Furthermore, the Court of Appeals has enumerated six factors relevant to the determination of reasonableness:

(1) [T]he area, or scope, of the restriction; (2) the area assigned to the employee; (3) the area where the employee actually worked or was subject to work; (4) the area in which the employer operated; (5) the nature of the business involved; and (6) the nature of the employee's duty and his knowledge of the employer's business operation."

*Hartman*, 117 N.C. App. at 312, 450 S.E.2d 917.

{48}    Applying these factors to the case at bar, the Court concludes that the territorial restriction in Scruggs's covenant not to compete is unreasonable.  The covenant not to compete extends to the entire state of North Carolina, and Scruggs was available for assignment anywhere in the state.  However, Scruggs only worked in four counties in western North Carolina:  Caldwell, McDowell, Burke, and Alexander.  Her actual contact with clients was limited to these areas.  The purpose of the covenant was to protect the customer relationships of CNC/Access from erosion due to Scruggs's knowledge and contact with customers.  Scruggs had no knowledge of or contact with CNC/Access customers outside of the four counties mentioned above, and posed no threat to the company's customer relationships in other parts of the state.  Plaintiff's argument that the territory restriction is reasonable because Scruggs technically *could* have been assigned to any part of the state is unavailing, and the statewide territorial restriction is unreasonable.

{49}    Considered in tandem, the three year time restriction and the statewide territorial restriction combine to produce a covenant not to compete that in unreasonable as to time and territory.

{50}    The scope of a covenant not to compete must be "designed to protect a legitimate business interest of the employer."  *Hartman*, 117 N.C. App. at 311, 450 S.E.2d at 916.   The courts have recognized that the protection of customer relations is a "legitimate business interest" of an employer.  *See, e.g.*, *Farr*, 138 N.C. App. at 280, 530 S.E.2d at 881.  Yet the covenant cannot restrict too many activities.  *See Henly Paper Co. v. McAllister*, 253 N.C. 529, 534–35, 117 S.E.2d 431, 434 (1960).  The Court of Appeals addressed the permissible scope of a covenant not to compete in *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 606 S.E.2d 359 (2004).  The covenant at issue in *VisionAIR* said that the employee could not "own, manage, be employed by or otherwise participate in, directly or indirectly, any business similar to Employer's."  *Id.* at 508, 606 S.E.2d at 362.  The court seized upon the prohibition on indirect ownership of a similar business, and noted that it would prohibit the employee from "holding interest in a mutual fund invested in part in a firm engaged in business similar to VisionAIR."  *Id* at 509, 606 S.E.2d at 363.

{51}    The covenant at issue here contains a similar provision.  Scruggs is prohibited from competing with CNC/Access "directly or indirectly, individually or as an employee, partner, officer, director or stockholder or in any other capacity whatsoever of any person, firm, partnership or corporation."  (Scruggs Employment Agreement § 6.A., Compl. Ex. 1.)  By prohibiting Scruggs from even indirect ownership of a competing company, the covenant goes farther than is necessary to prevent Scruggs from competing for the customers of CNC/Access.  It therefore cannot be seen as protecting a legitimate business interest of the employer.

{52}    Finally, a covenant not to compete cannot be against public policy. When addressing arguments based on "public policy," the courts must be cautious.  An English judge once warned that public policy is "a very unruly horse, and once you get astride it you never know where it will carry you."  *See Farnsworth on Contracts*, *supra*, § 5.2.  It has been defined rather ambiguously as "principles and

standards regarded by the legislature or by the courts as being of fundamental concern to the state and the whole of society." *Black's Law Dictionary* 1245 (7th ed. 1999).

{53} Fortunately the policy of the legislature with regard to patient choice in health care in North Carolina is remarkably clear. Our statutes proclaim that "[t]he General Assembly recognizes as a matter of public policy the fundamental right of an individual to control the decisions relating to the individual's mental health care." N.C. Gen. Stat. § 122C-71(a). The courts have also noted the importance of patient choice among physicians. *See, e.g.*, *Statesville Med. Group v. Dickey*, 106 N.C. App. 669, 418 S.E.2d 256 (1992); *Iredell Digestive Disease Clinic v. Petrozza*, 92 N.C. App. 21, 373 S.E.2d 449 (1988). Whatever "public policy" may be, both the legislative and judicial branches have made clear that patient choice in health care is fundamentally important to the citizens of North Carolina.

{54} As a consequence of this public policy in favor of patient choice, consumers in the MD/DD/SA field are entitled to select their caregivers. The covenant not to compete at issue in this case restricts that right by purporting to prohibit Scruggs from working in the field for three years and across the entire state. As stated above, this is more than is reasonably necessary to protect the economic interests of CNC/Access. Moreover, it erodes patient choice in the affected region to an extent that this Court cannot approve.

{55} For the foregoing reasons, the noncompetition provision in Scruggs's contract with CNC/Access is invalid and unenforceable. Defendants' motion for summary judgment as to this claim is granted.

6.

## BREACH OF COVENANT NOT TO DISCLOSE CONFIDENTIAL INFORMATION

{56} Defendant Greer is a party to a Noncompetition, Confidentiality, and Nonsolicitation Agreement ("Greer Agreement") with CNC. Plaintiff alleges Greer breached the confidentiality portions of the agreement by improperly utilizing CNC trade secrets for the benefit of Universal.

{57} In light of the Court's ruling on Defendants' motion for summary judgment on misappropriation on trade secrets, their motion for summary judgment on breach of covenant not to disclose confidential information claim is denied. The claim thus survives to the extent it is based on the use of the fifty-seven policies and forms contained in Defendants' Deposition Exhibit 29.

7.

## UNFAIR TRADE PRACTICES

{58} Under N.C. Gen. Stat. § 75-1.1(a), "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." Plaintiff claims that Defendants engaged in unfair methods of competition by misusing confidential information of CNC. The Court will allow the claim of unfair trade practices based on the alleged use of the fifty-seven policies and forms contained in Defendants' Deposition Exhibit 29.

{59} The Court has painstakingly compared all the documents in Defendants' Deposition Exhibit 29. (Def.'s Joint Mot. for Summ. J. App. 34.) The documents consist primarily of human resources policies, forms, and other documents used internally at both CNC and Universal. The Court makes the following observations about those documents.

{60} In many instances, Universal obviously used the CNC personnel manual as a model. Some sections are slavishly copied with only small format changes such as changing paragraph numbers to

letters or vice versa. Most of the policies copied were standard personnel policies dictated by federal laws or regulations. Examples include overtime, family leave, military leave, and COBRA policies. There were no policies that were unique or provided any kind of competitive advantage. The main benefit Universal received from copying the CNC policies was getting the policies written quicker and cheaper. The Court does not find such copying to be a significant factor in Universal's ability to get started and compete. Universal's executives had ample experience to know what policies were needed and what their basic content should be. The time and effort required to put the Universal manual together was clearly reduced by copying the CNC manual.

{61}    Some Universal documents and policies were not copied from CNC. Some policies not governed by laws or regulations were different. Universal added Martin Luther King, Jr. Day as a holiday for example and had a different vacation policy.

{62}    There were certain documents which Universal copied that would not have been publicly available. The Documentation Test and another test administered to new employees were simply copied rather than Universal taking the time and effort to create its own.

{63}    There were other documents Universal used that were clearly available and unprotected. The Independent Contractor agreements are an example. The independent contractors were free to share those documents with Universal. There was no confidential information contained in them.

{64}    The job descriptions were also copied. Again, the information in the descriptions had no intrinsic value. The jobs were the same and the descriptions were not going to vary much. Universal avoided the time and effort involved in doing their own version, but that was the only competitive advantage obtained.

{65}    In summary, CNC has a claim that some of its human resource documents were copied and used by Universal without knowledge or consent. The use of those documents saved Universal time and money in drafting its own version of standard policies, but did not afford Universal any other competitive advantage. The misuse was an unfair trade practice which occurred in commerce in North Carolina.

{66}   Plaintiff suggests the facts of the case at bar are analogous to those in *Sunbelt Rentals, Inc. v. Head & Engquist Equipment, L.L.C.*, 174 N.C. App. 49, 620 S.E.2d 222 (2005), in which this Court found that defendant's hiring of plaintiff's branch managers and other personnel was a misappropriation of trade secrets and an unfair and deceptive trade practice. The Court disagrees with this assessment, and finds that the facts of this case are not analogous to those in *Sunbelt*.

{67}    *Sunbelt* involved two companies in the business of renting construction equipment. *Id.* at 50, 620 S.E.2d at 225. In the fall of 1999, the president and vice president for finance of BPS Equipment Rental and Sales ("BPS") resigned their positions and began working for a competitor, the Hi-Lift Division of Head & Engquist Equipment, L.L.C. ("H&E"). *Id.* at 51, 620 S.E.2d at 225. By the summer of 2000, the former BPS officers had hired several branch managers away from BPS and successfully established H&E in seven cities where the company had no previous market presence. *Id.* In each new city, "a significant number of key BPS personnel, if not all," defected to H&E. *Id.*

{68}    *Sunbelt* thus involved the departure of a significant number of key employees, resulting in the overnight establishment of H&E in seven new markets. In comparison, the number of CNC employees who left for Universal is inconsequential. There was no mass exodus of key employees here as was the case in *Sunbelt*, and Universal was not able to quickly establish itself in multiple locations as H&E did. Nor was there any surreptitious recruitment of CNC employees.

C.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANTS' COUNTERCLAIMS

{69}    Defendant Scruggs counterclaims  for (1) defamation, (2) malicious prosecution, and (3) unfair and deceptive trade practices.  Defendants Greer and Universal counterclaim for (1) defamation, (2) tortious interference with prospective economic advantage, and (3) unfair and deceptive trade practices.

1.

DEFAMATION

{70}    All Defendants have counterclaimed against Plaintiff for defamation based on Plaintiffs communications as described in section II.D. above.  Plaintiff has moved the Court to grant summary judgment as to the defamation claims.

{71}  "Defamation" is an umbrella term encompassing two distinct torts—libel and slander.  *See, e.g.*, *Tallent v. Blake*, 57 N.C. App. 249, 251, 291 S.E.2d 336, 338 (1982).  Libel is generally defamation in written form, while slander is spoken.  *Id.*  However, the line between the two forms of defamation is sometimes unclear.  For example, "[w]hen defamatory words are spoken with the intent that the words be reduced to writing, and the words are in fact written, the publication is both slander and libel."  *Clark v. Brown*, 99 N.C. App. 255, 261, 393 S.E.2d 134, 137 (1990).  A libelous or slanderous statement which impeaches the plaintiff in his trade, business, or profession is considered libel or slander per se.  *E.g.*, *Raymond U v. Duke University*, 91 N.C. App. 171, 181, 371 S.E.2d 701, 708 (1986) (regarding slander per se); *Renwick v. News & Observer Pub. Co.*, 310 N.C. 312, 317, 312 S.E.2d 405, 409 (1984) (regarding libel per se).  The consequence of a statement being classified as libel or slander per se is a presumption of injury to reputation, damages, and malice.  50 Am. Jur. 2d *Libel and Slander* § 139 (2006).

{72}    The publisher of an allegedly defamatory statement may avoid liability in some situations by asserting either an absolute or a qualified privilege.  *E.g.*, *Alpar v. Weyerhauser*, 20 N.C. App. 340, 346, 201 S.E.2d 503, 507 (1974).  An absolute privilege only exists in "cases in which it is so much to the public interest that the defendant should speak out his mind fully and freely that all actions in respect to the words used are absolutely forbidden, even though it be alleged that they were used falsely, knowingly, or with express malice."  *Ramsey v. Cheek*, 109 N.C. 270, 274, 13 S.E. 775 (1891).  A qualified privilege allows a plaintiff to recover "if he can prove that the words were not used bona fide, but that the defendant used the privileged occasion artfully and knowingly to falsely defame the plaintiff."  *Id.*  The determination of whether an occasion is privileged is a question of law for the court.  *Hanton v. Gilbert*, 126 N.C. App. 561, 567, 486 S.E.2d 432, 437 (1997).

{73}    Turning to the facts of this case, the Court finds no grounds for the existence of an absolute privilege.  Plaintiff, relying on *Smith v. McDonald*, 895 F.2d 147 (4th Cir. 1990), argues that "certain of the complaints, those filed with governmental agencies with regulatory authority, may well invoke the absolute privilege which attaches to statements made in a quasi judicial context."  (Pl. Br. Supp. Mot. for Summ. J. 13.)

{74}     "[C]ommunications made in the course of an administrative proceeding are absolutely privileged if the administrative officer or agency is exercising a judicial or quasi-judicial function."  *McDonald*, 895 F.2d at 149.  The term "quasi-judicial" is not clearly defined, but was addressed both in *McDonald* and in *Angel v. Ward*, 43 N.C. App. 288, 258 S.E.2d 788 (1979).  In both *McDonald* and *Angel*, the administrative proceedings at issue involved pending investigations, and both courts found that the

proceedings were quasi-judicial. In *Angel*, a private citizen sent a letter to the supervisor of a federal employee. The supervisor was already investigating the employee, and the Court of Appeals found that this was a "quasi-judicial" proceeding. Summarizing *Angel*, the Fourth Circuit observed that "evidence of the supervisor's ongoing investigation and solicitation of the letter . . . was necessary to demonstrate that the supervisor was performing a quasi-judicial function in connection with the performance of his duty with respect to a particular employee . . . and that the letter was not merely a complaint about the performance of a public employee and so entitled to a qualified privilege." *McDonald*, 895 F.2d at 150 n.4. In *McDonald*, the defendant wrote two letters to the president of the United States regarding a candidate for United States attorney who was ultimately passed over. *Id.* at 148. The court found that the president was performing a quasi-judicial function because he was investigating facts regarding the appointment. *Id.* at 151.

{75}    Here, CNC/Access complained of Defendants to a number of government agencies, none of whom were actively investigating Scruggs, Greer, or Universal. Indeed, CNC/Access initiated each of these complaints. Thus, Plaintiff's assertions of absolute privilege on these facts are unfounded. These communications were mere complaints, and are entitled to a qualified privilege at most.

{76}   The Court of Appeals summarized the law of qualified privilege as follows:

> A defamatory statement is qualifiedly privileged when made:  (1) in good faith, (2) on subject matter (a) in which the declarant has an interest or (b) in reference to which the declarant has a right or duty, (3) to a person having a corresponding interest, right, or duty, (4) on a privileged occasion, and (5) in a manner and under circumstances fairly warranted by the occasion, right, or interest. The existence of the privilege creates a presumption that the communication was made in good faith and without malice. To rebut this presumption, the plaintiff must show the statement was made with actual malice.

*Barker v. Kimberly-Clark Corp.*, 136 N.C. App. 455, 460, 524 S.E.2d 821, 825 (2000). In order to prove that a statement was made with "actual malice," a plaintiff must show "evidence of ill-will or personal hostility on the part of the declarant" or that "the declarant published the defamatory statement with knowledge that it was false, with reckless disregard for the truth or with a high degree of awareness of its probable falsity. *Id.* at 461, 524 S.E.2d at 825.

{77}   A qualified privilege may exist on these facts. However, there is sufficient evidence of malice and ill-will to raise a question of fact to be resolved by the trier of fact. The qualified privilege may exist because CNC/Access has an interest in preserving its customer base, and some of the agencies to which it complained had a corresponding duty to protect consumers from inappropriate pressure on the part of departing CNC/Access employees. However, the Court notes that there is no qualified privilege for complaints knowingly filed with an agency that has no jurisdiction to hear the claims asserted. *See Alexander v. Vann*, 180 N.C. 187, 104 S.E. 360 (1920); *Logan v. Hodges*, 146 N.C. 38, 59 S.E. 349 (1907). Here, Defendant argues that neither the United States Department of Health and Human Services nor the North Carolina Health Care Personnel Registry had jurisdiction over the situation. If these agencies indeed lack jurisdiction to address such matters, then CNC/Access enjoys no qualified privilege with respect to complaints submitted to them.

{78}   Based on the foregoing, there are genuine issues of fact as to whether CNC/Access can meet its burden of establishing a qualified privilege.

{79}    Assuming there is a qualified privilege, Defendants have presented sufficient evidence of

malice and ill will on the part of Plaintiff to present a genuine issue of fact. Scruggs has testified that CNC/Access executive Tommy Voegeli told her he would "ruin her reputation (Scruggs Dep. 20). Scruggs's supervisor, Joy Stigall, testified that she would "bash" Scruggs around the office. (Stigall Dep. 104.) There is also testimony that Stigall's supervisor called for a "public hanging" of Scruggs. (Voegeli Dep. 149.) There is similar evidence as to Greer and Universal. Judy Hardy publicly disparaged Greer and admitted that she filled out a draft ethics violation form to the NCHCPR to vent her "rage and frustration." (CNC Dep. 870-71.)

{80} Based on the foregoing, a factfinder could conclude that there was malice and ill will on the part of CNC/Access such as to preclude the protection of any qualified privilege that may apply to its communications with third parties. Defendants' defamation claims are therefore not subject to summary judgment.

2.

MALICIOUS PROSECUTION

{81} By Notice of Dismissal, filed May 22, 2006, Defendant Scruggs voluntarily dismissed without prejudice her counterclaim for malicious prosecution, thereby rendering moot Plaintiff's motion for summary judgment on that claim.

3.

TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

{82} Defendants Greer and Universal counterclaim for tortious interference with prospective economic advantage on the part of CNC. These Defendants claim that CNC interfered with Universal's prospective relationships with the Providers Council, the Western Highlands LME, and at least one employee—Sherry Douglas.

{83} As noted above, a plaintiff must show the following in order to prevail on a claim for tortious interference with prospective economic advantage:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988) (citing *Childress v. Abeles*, 240 N.C. 667, 674, 84 S.E.2d 176, 181-82 (1954)).

{84} The Court finds that there are genuine issues of material fact upon which a fact finder could conclude that CNC acted without justification and that Universal suffered damage. Plaintiff's motion for summary judgment as to this claim is therefore denied.

4.

UNFAIR AND DECEPTIVE TRADE PRACTICES

{85} Defendants counterclaim for unfair and deceptive trade practices based on the alleged defamation and its surrounding facts. They also allege that CNC filed the original lawsuit "for the purpose of harassing, intimidating and coercing Universal, its employees and prospective employees, and to force Universal out of business." (Scruggs Countercl. ¶ 77.)

{86} The Court grants in part and denies in part Plaintiff's motion for summary judgment on Defendants' claim of unfair trade practices. The filing of this lawsuit by Plaintiff did not constitute unfair

trade practices. As indicated by the foregoing discussion, there was a genuine question of fact and/or law over the enforceability of the noncompetition provision in Defendant Scruggs's employment contract with CNC. Thus, Defendants' claims of unfair trade practices are dismissed, except to the extent they are based on Defendants' defamation claims.

## V.
## CONCLUSION

{87} Based upon the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED that Plaintiff and Defendants' cross motions for summary judgment are granted in part and denied in part as follows:

1. Defendants' motion for summary judgment as to Plaintiff's claim for breach of contract against Defendant Scruggs is GRANTED.

2. Defendants' motion for summary judgment as to Plaintiff's claim for misappropriation of trade secrets is DENIED to the extent it is based on the alleged use of the fifty-seven policies and forms contained in Defendants' Deposition Exhibit 29.

3. Defendants' motion for summary judgment as to Plaintiff's claims for tortious interference with contract and/or prospective economic advantage is GRANTED.

4. Defendants' motion for summary judgment as to Plaintiff's claim for breach of covenant not to compete against Defendant Scruggs is GRANTED.

5. Defendants' motion for summary judgment as to Plaintiff's claim for breach of covenant not to disclose confidential information against Defendant Greer is DENIED to the extent it is based on the alleged use of the fifty-seven policies and form contained in Defendants' Deposition Exhibit 29.

6. Defendants' motion for summary judgment as to Plaintiff's claim for unfair trade practices is DENIED to the extent it is based on the alleged use of the fifty-seven policies and form contained in Defendants' Deposition Exhibit 29.

7. Plaintiff's motions for summary judgment as to Defendants' counterclaims for defamation are DENIED.

8. Plaintiff's motions for summary judgment as to Defendants' counterclaims for unfair trade practices are DENIED to the extent it is based on Defendants' counterclaims for defamation.

9. Plaintiff's motion for summary judgment as to Defendants Greer and Universal's counterclaim for tortious interference with prospective economic advantage is DENIED.

IT IS SO ORDERED, this the 15th day of November 2006.