Mechanical Sys. & Serv., Inc. v. Carolina Air Solutions, L.L.C., 2003 NCBC 9

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
02-CvS-8572

|  |  |  |
|---|---|---|
| MECHANICAL SYSTEMS & SERVICES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | **ORDER AND OPINION** |
| CAROLINA AIR SOLUTIONS, L.L.C., LARRY D. COPELAND and RODNEY L. GORDON, | ) ) ) ) | |
| Defendants. | ) ) ) | |

{1}     This case arises out of a contractual dispute regarding restrictions on the stock held by former employees in a closely held corporation. Plaintiff Mechanical Systems & Services, Inc. ("Mechanical") has brought this action against defendants — former employees and their company — based on claims which include breach of contract, misappropriation of trade secrets, breach of fiduciary duty, tortious interference with prospective economic advantage, and violating the North Carolina Unfair and Deceptive Trade Practices Act ("NC UDTPA"), and seeks to enforce a stock sell back provision in a contract. The individual defendants have counterclaimed against plaintiff, alleging breach of contract, the denial of the right to inspect corporate records, and misrepresentation, and seek to invalidate the price in the sellback provision and enforce a buyback at a court-determined price. This matter is before the Court on motions of plaintiff and defendants for summary judgment.

*Knox, Brotherton, Knox & Godfrey by Lisa G. Godfrey, for Plaintiff.*

*Roberts & D'Agostino by Daniel D. D'Agostino, for Defendants.*

# I.
## FACTUAL BACKGROUND

{2}     Plaintiff Mechanical is a North Carolina corporation with a principal place of business in Mecklenburg County. Defendant Carolina Air Solutions, L.L.C. ("Carolina Air") is a North Carolina limited liability company. Defendants Larry D. Copeland and Rodney L. Gordon are members of Defendant Carolina Air. Mechanical and Carolina Air are competitors in the business of the construction and maintenance of mechanical systems for commercial customers in the Carolinas.

{3}     Plaintiff induced Copeland and Gordon to accept employment from Mechanical with the promise of an ownership interest in the company. Before joining Mechanical, both Copeland and Gordon worked at Layne Trane with Hunter Edwards, the president and majority owner of Mechanical. Edwards solicited Copeland and Gordon to join the newly founded Mechanical with various incentives including a 5 percent ownership interest in the company for each if they worked there for two years. Edwards did not indicate a corporate structure with different classes of stock or that Copeland and

Gordon would have to execute a stock purchase agreement when they accepted employment at Mechanical. Copeland and Gordon worked at Mechanical for two years. As they and other employees fulfilled their two-year obligation to obtain their stock, Mechanical restructured its stock to include two classes with restrictive covenants and different voting rights.

{4}    On May 14, 1998, Mechanical amended its Articles of Incorporation to create two classes of stock. Class One stock granted the shareholder of that class voting rights. Class Two stock, however, did not grant the shareholder any voting rights. On June 1, 1998, the Mechanical Board of Directors (the "Board") authorized the issuance of Class Two stock to certain employees at a purchase price of $1 per share. Mechanical issued 50 shares of Class Two stock, and a 5 percent ownership interest in the corporation to both Copeland and Gordon. Copeland was a service technician, later promoted to sale representative; Gordon was a service technician at the company. Neither were management level employees, and they were not experienced businessmen.

{5}    The Board also adopted a resolution that authorized Mechanical to execute a Stock Restriction Agreement (the "Agreement") with the purchasers of the Class Two stock. The dispute arises out of the Agreement concerning the Class Two non-voting stock purchased by Copeland and Gordon: more specifically, on four paragraphs within the Agreement that address the restriction on the Class Two stock.

{6}    In essence, the Agreement results in the Class Two shares only having value if the Company is sold while the shareholder is still employed. Paragraph II enumerates particular events that trigger the requirement for a Class Two shareholder to sell his stock. Section D of Paragraph II requires a Class Two shareholder who is also an employee of Mechanical to sell back his shares to the corporation upon termination of employment. Paragraph III states that upon the termination of employment Mechanical has within sixty days to notify the shareholder of its intent to repurchase the outstanding shares. Paragraph IV lists "the value" of the Class Two stock as $1 per share. Paragraph IX is a "merger clause" that holds that the Agreement supersedes all prior agreements and constitutes the entire agreement between all the parties.

{7}    On March 25, 2002, Copeland and Gordon willingly terminated their employment with Mechanical to start Carolina Air. On April 4, 2002, Mechanical sent a letter via certified mail to both Copeland and Gordon. The letter notified Copeland and Gordon that the corporation intended to repurchase all of their Class Two shares at $1 per share as provided in the Agreement. Several days later, Mechanical received letters from Copeland and Gordon stating their intent not to sell back their Class Two stock to the corporation at the $1 per share price provided for in the Agreement.

{8}    On March 25, 2002, Copeland and Gordon also placed a bid for mechanical contract work at the Jonas Federal Building ("Federal Building") in Charlotte. The project involved rebuilding and replacing a chiller for the mechanical system in the Federal Building. Gordon had discovered the defective chiller while working as a Mechanical service technician at the Federal Building. Copeland had been the Mechanical service sale representative assigned to the Federal Building account. The project was a publicly bid contract. Mechanical had previously bid on the work, but the project had been delayed.

{9}    After departing Mechanical, Copeland contacted Dale Starnes of the Government Services Administration ("GSA"). Starnes informed Copeland that the contract to repair the defective chiller at the Federal Building was again up for bid. The GSA sent out the bid to IDIQ contractors ("IDIQ") to

serve as the general contractor. Copeland contacted Don Neal ("Neal") at IDIQ, with whom he had an ongoing professional relationship. Neal provided Copeland with information about the bid, and defendants worked up a subcontractor bid and submitted it to IDIQ the same day. The bid did not incorporate any confidential information obtained during the defendants' tenure at Mechanical.

## II.

### SUMMARY JUDGMENT STANDARD

{8} Pursuant to Rule 56(c) of the North Carolina Rules of Civil Procedure, summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that no genuine issue of material fact exists and that any party is entitled to judgment as a matter of law. N.C. R. Civ. P. 56(c). A genuine issue is one that can be maintained by <u>substantial</u> evidence; a material fact constitutes a legal defense preventing the non-moving party from prevailing. *Bd. of Ed. of Hickory Admin. School Unit v. Seagle*, 120 N.C. App. 566, 463 S.E.2d 277 (1995).

{9} The North Carolina Court of Appeals explained that a summary judgment movant meets the burden of showing entitlement to judgment as a matter of law by demonstrating any one of three things. *Taylor v. Ashburn*, 112 N.C. App. 604, 606-607, 436 S.E.2d 276, 278 (1993), *cert. denied*, 336 N.C. 77, 445 S.E.2d 46 (1994). First, the movant may show an essential element of the non-movant's claim does not exist. Second, the movant may demonstrate that the non-movant cannot produce evidence to support an essential element of his claim. Third, the movant may prove that the non-movant cannot surmount an affirmative defense that would bar his claim. *Id.*

{10} The non-moving party, however, may not rest upon mere allegations or denials in its pleadings. N.C. R. Civ. P. 56(e). The non-moving party must offer evidence that establishes, beyond mere speculation or conjecture, the essential elements of its claims. *Id.*

## III.

### ENFORCEMENT OF CLASS TWO SHAREHOLDER AGREEMENT

{11} Plaintiff seeks to enforce the sellback provision in the Agreement against Copeland and Gordon as to their holdings of Class Two stock. North Carolina statutes and courts protect the right of a corporation to employ stock restriction agreements. N.C.G.S. § 55-6-27; *see, e.g.*, *Crowder Construction Co. v. Kiser*, 134 N.C. App. 190, 517 S.E.2d 178 (1999), *review denied*, 351 N.C. 101, 541 S.E.2d 142 (1999). A stock restriction agreement, however, is a contract and thus is subject to the same legal limitations on contracts, including the law of unconscionability. *Crowder*, 134 N.C. App at 206, 517 S.E.2d at 189.

{12} North Carolina has a well-developed body of law that addresses unconscionability as it pertains to contract disputes. *Crowder*, 134 N.C. App at 206, 517 S.E.2d at 190. Courts will invoke unconscionability and refuse to enforce a contract if "the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Brenner v. Little Red School House, Ltd.*, 302 N.C. 207, 213, 274 S.E.2d 206,210 (1981). A court determines if a contractual provision is unconscionable by examining all the facts and circumstances of the case. *Id.* If the court finds that the provision was so unilateral that one party did not have the opportunity for a meaningful choice, then that provision is unconscionable. *See id.*

{13}    Defendants claim that the Agreement is unconscionable because the mandatory buyback value for the stock is $1 per share, which is identical to the purchase price and substantially less than the actual value. In 2002, the book value of a 5 percent ownership interest in Mechanical was $36,776. Defendants, moreover, assert that the creation of the Class Two stock is unconscionable because the limitations in the Agreement rendered the stock worthless. Mechanical represented to these workers that they would own 5 percent of the corporation upon employment. The promise of 5 percent ownership was used as an inducement to employees to leave their former employers to work for Mechanical. They worked the required two years to qualify for their ownership.

{14}    Plaintiff claims that the law of unconscionability does not apply because defendants received adequate compensation for services through salary, insurance and various other fringe benefits. Defendants were "at will" employees. They had no employment agreements. Plaintiff furthermore relies on the fact that both the Class One and Class Two stock restriction agreements included provisions that limited the buyback price of employee stock upon termination to $1 per share. Mechanical alleges that the goal in issuing the stock was not to create present benefit but to reward employee loyalty and tenure with pecuniary gain only if another entity acquired the corporation. No such limitation was explained to Copeland, Gordon or any other Class Two stock holder at the time they left their previous employment to join Mechanical. They were only told they would get a 5 percent interest if they stayed two years. No mention was made of any restriction that said that their stock would be worthless unless the company were sold. Mechanical paid no dividends and preserved some profits as retained earnings to build equity in the corporation, a practice which benefited the employee shareholders, but only if the company were sold.

{15}    The circumstances surrounding the entire stock transaction demonstrate its unconscionability. *See Brenner*, 302 N.C. at 213, 274 S.E.2d at 210. First, the stock is worthless to the employees because the Agreement prevents a former employee from realizing any value from the shares on the mandatory sellback. If the employee retires, dies, is disabled or fired without cause the stock is worth only $50. Mechanical provided the stock to employees as an incentive to leave their past employer to work for plaintiff. A rational worker would only find incentive in the potential to realize a financial gain. Plaintiff's argument that employees received adequate compensation in other forms is irrelevant because the original inducement was a promise of a 5 percent ownership interest in Mechanical in addition to the normal benefits. The Agreement prevented the employees from realizing any meaningful financial gain by establishing a sellback price equal to the issuance price.

{16}    With respect to Copeland and Gordon, they had fulfilled the two-year employment requirement before they were confronted with the stock restrictions. They were not sophisticated businessman. They were left with no choice but to sign the Agreement if they wanted their stock. The bargaining power between them and the company was severely tilted on the favor of Mechanical. Mechanical was free to adopt a stock purchase plan which had a vesting schedule if it wished to insure long term employment, provided it accurately represented the plan to prospective employees. Here, Mechanical sought to impose restrictions that made the stock worthless after the employees had worked two years and subsequently changed jobs.

{17}    Plaintiff's claim that Mechanical's significant retained earnings proves that the stock was an instrument of pecuniary gain for employees is without merit. The retained earnings increased the book value of the company. The underlying value of the Mechanical stock issued to the employees

increased because securities in a closely held corporation reflect the book value of a corporation. Stock in a closely held corporation is not subject to the rapid fluctuations in market value that publicly traded entities experience on the exchanges. Closely held corporations, particularly contractors, are often valued based on the book value of their assets minus existing liabilities. Retained earnings increase the assets on the corporate balance sheet and increase overall value barring offsetting liabilities. The increase in book value from the retained earnings only strengthens defendants' claim that the $1 per share buyback price is unconscionable.

{18}  The other difficulty with plaintiff's argument results from the Option to Purchase Shares Agreement ("Option Agreement") Mechanical entered into with Michael G. Carter ("Carter"), a division general manager. The Option Agreement provided that Carter could purchase at a negotiated price the Class Two shares that the corporation repurchased from terminated employees. These Class Two shares would then convert to Class One shares to increase Carter's ownership interest in Mechanical to a maximum of 49 percent.

{19}  The Option Agreement viewed in tandem with the Agreement speaks to the unconscionabilty of the repurchase provision in the Agreement. Mechanical requires that employees, upon termination, sell their Class Two shares back to the corporation at $1 per share. The Option Agreement allows Carter, however, to repurchase these shares at a negotiated price and then convert this Class Two stock into Class One. The corporation uses the Agreement and the Option Agreement to enable the repurchase of the Class Two shares at $1 per share and then to realize a gain by selling the same stock to Carter at a negotiated price. Defendants therefore realize no gain from the repurchase and provide the plaintiff an opportunity to reap a profit on the resale to Carter.

{20}  Defendants left previous employers and accepted employment with Mechanical in return for a promise of a 5 percent ownership interest in the corporation. The Stockholders' Equity was $735,528 as of the 2002 year-end financial report. Under the Agreement, defendants must sell their 5 percent ownership interest back to the corporation for $50. The book value of the 5 percent ownership interest is worth $36,726 more than the $50 for which the Agreement requires the defendants to sell back their stock to the corporation. Under the Agreement, defendants may not hold the stock after termination to realize gain from the future acquisition of Mechanical by another entity. The Agreement forces the defendants to sell an ownership interest they earned by accepting employment at Mechanical at a price that does not reflect the value of their holdings.

{21}  The circumstances surrounding the entire transaction involving the issuance of stock and the Agreement indicate that a reasonable person would not assent to these terms. The Agreement rendered the shares virtually worthless because the possibility of defendants realizing any capital gain was almost nonexistent. The bargain is unconscionably out of balance, as the defendants left prior employment in exchange for a promise of an ownership interest which was converted by Mechanical to a restricted ownership interest with value only if the company were sold while they were still employed. That restriction was never disclosed to them until after two years of employment when the company was faced with honoring the commitment to give the employees stock.

{22}  Plaintiff cites *Crowder Constr. Co. v. Kiser* , 134 N.C. 190, 517 S.E.2d 178 (1999), to support the proposition that the buyback provisions in the Agreement do not qualify as unconscionable. *Crowder*, however, is easily distinguished from the case at hand. In *Crowder*, the defendant was a terminated executive who had entered into a buyout agreement that specified book value as the method to

calculate the value of his stock in the company. The defendant argued that fair market value was the correct valuation method and that applying book value was unconscionable. The defendant refused to sell back the shares to the corporation and the plaintiff subsequently brought an action to enforce the agreement. Both this Court and the Court of Appeals held that the defendant had to sell the shares to the plaintiff at book value per the agreement and that the buyout agreement did not qualify as unconscionable.

{23}    In the case at hand, however, the dispute over unconscionability does not center on differing valuation methods. The Agreement between Mechanical and defendants does not provide the opportunity for any gain on the Class Two stock. Defendants must sell the stock back to Mechanical at the purchase price regardless of the financial condition of the corporation. In contrast, *Crowder* involved a dispute on the amount of gain that the defendant might realize in the buyout agreement depending on the chosen valuation method. *Crowder* is also distinguishable because the employee was a sophisticated financial executive who helped create the stock purchase agreement. The former employee had not left prior employment to join the company on the promise of the receipt of stock. *Crowder*, therefore, provides little guidance as to unconscionability because the facts of that dispute are not analogous to the instant case.

{24}    Defendants claim that as matter of law plaintiff breached the contract by not paying defendants for the true value of their 5 percent ownership interest. The Agreement, however, does not specify a purchase price other than $1 per share. The Agreement provides no other means to value the ownership interest of the defendants, nor does it require repurchase. Defendants were not promised their stock would be repurchased if they left. There is no statutory authority for this Court to order a buyback and determine a value. The Court has invalidated the buyback provision as unconscionable. There are no allegations of mismanagement or any other basis for the Court to order repurchase of the minority shares. Defendants have what they bargained for — an unrestricted stock ownership.

{25}    North Carolina recognizes that merger clauses are valid contractual provisions and the courts consistently uphold their use. *Zinn v. Walker,* 87 N.C. App. 325, 333, 361 S.E.2d 314, 318 (1987), *rev. denied*, 321 N.C. 747, 366 S.E.2d 871 (1988). In the instant case, the Agreement contained a merger clause that stated:

> This agreement constitutes the final, exclusive and complete understanding of the parties with respect to the subject matter contained herein and may not be modified, changed or supplemented, nor may any obligations hereunder be waived or extension of time for performance granted except by written instrument signed by the party to be charged.

{26}    The existence of a merger clause does not prohibit the Court from finding the contractual provision unconscionable under the circumstances of this case. The Court upholds the balance of the Agreement aside from the mandatory buyback, as there is no breach of contract claim if there is no contractual mandatory buyback. The Agreement clearly speaks to the purchase price and the restrictions. Under North Carolina law, plaintiff did not breach the contract. *See Zinn,* 87 N.C. App. at 333, 361 S.E.2d at 318. The breach of contract clause fails because plaintiff fulfilled its duties under the Agreement, and the merger clause prevents the supplementation of the Agreement by prior or oral agreements.

{27}    The Court therefore finds unconscionable the provisions in the Agreement that require the defendants to sell back the Class Two shares to Mechanical for $1 per share. Defendants may continue to hold their shares in Mechanical. An ownership interest is what defendants bargained for

and it is not unconscionable that there is no mandatory buyback. Accordingly, Plaintiff did not breach the contract.

## IV.
## UNFAIR AND DECEPTIVE TRADE PRACTICES AND
## TRADE SECRETS PROTECTION CLAIMS

{28}    Plaintiff alleges that the actions of defendants regarding the Federal Building violated the North Carolina Unfair and Deceptive Trade Practices Act ("NC UDTPA"). Plaintiff asserts that defendants unfairly used knowledge obtained as employees of Mechanical to submit a bid to repair and replace the defective chiller. Defendants placed a bid on the project the day of their resignations, and plaintiff argues that the timing indicates a misappropriation of information.

{29}    N.C.G.S. § 75-1.1 defines the elements necessary for a claim under the UDTPA as follows:

(a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.
(b) For the purposes of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.

{30}    The courts in North Carolina apply a three-prong test to determine violations of the UDTPA. The first two prongs of the test reiterate the required elements of an unfair or deceptive act that affects commerce. *See Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). The third prong requires that the unfair act proximately cause an actual injury to the plaintiff. *Id.* The analysis in the instant case, however, need only reach the first prong addressing unfairness.

{31}    The Court must determine as a matter of law, under the first prong, whether the defendants' actions under these proven facts constituted an unfair or deceptive trade practice. *Hardy v. Toler*, 288 N.C. 303, 309, 218 S.E.2d 342, 346 (1975). The first prong finds that a trade practice is unfair if the conduct undermines the ethical standards and good faith dealings between parties engaged in business transactions. *First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 131 N.C. App. 242, 252, 507 S.E.2d 56, 63 (1998). Defendants' actions concerning the Federal Building therefore must deviate from fair and ethical business practices to satisfy the first prong.

{32}    Defendants' actions do not amount to unethical behavior or bad faith dealings. Mechanical did not put a second bid on the Federal Building project even though they knew about the project. To the extent Mechanical argues that defendants had a duty to tell Mechanical the bid was coming up, the Court holds that no such duty exists. Defendants used independent subcontractors to compute the bid and thus placed a bid through a different source than Mechanical's channels. Furthermore, no evidence exists that defendants copied a planned bid or used confidential information from Mechanical to create a bid. The use of Mechanical information poses little relevance in this situation because Mechanical did not submit a competing bid.

{33}    Defendants, moreover, did not owe a fiduciary duty to Mechanical. A managerial employee does not have the capacity to exercise the domination and influence over others required to create a fiduciary relationship. *See Dalton v. Camp*, 353 N.C. 647, 652, 548 S.E.2d 704, 708 (2001); *Reichhold Chem., Inc. v. Goel*, 146 N.C. App. 137, 155, 555 S.E.2d 281, 292 (2001). Copeland and Gordon did not qualify as managers at Mechanical because they worked in line positions in sales and service departments. Defendants therefore were not in a fiduciary relationship with Mechanical and

did not owe a heightened duty to plaintiff. This case is controlled by *Dalton v. Camp* and presents an even weaker set of facts upon which to find an unfair trade practice or a breach of fiduciary duty.

{34} Plaintiff also claims that defendants' actions involving the Federal Building violated the Trade Secret Protections Act, N.C.G.S. § 66-152 et. seq. Plaintiff asserts that defendants misappropriated Mechanical's confidential information to secure the project at the Federal Building. The North Carolina statute defines misappropriation as the use of another's trade secret without express or implied consent. N.C.G.S. § 66-152(3); *Area Landscaping v. Glaxo-Wellcome*, 586 S.E.2d 507, 2003 N.C. App. LEXIS 1825 (2003). The statute defines a trade secret as:

> Business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
> a. *Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development* or reverse engineering by persons who can obtain economic value from its disclosure or use; *and*
> b. *Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy*.

N.C.G.S. § 66-152(3) (emphasis added).

{35} The existence of the defective chiller was not subject to any secrecy. Defendants learned about the defective chiller as employees on a Mechanical project at the Federal Building. The bid, however, was open to the public through general contractors. Mechanical had the opportunity to obtain bidding information through general contractors or the General Services Administration ("GSA"). Mechanical employees, moreover, knew about the bidding process and plaintiff still did not use any corporate resources to prepare a bid. Plaintiff possessed no information about the bid that was not available to any other business operating within the same industry in the Charlotte area. As aforementioned, there is no evidence that defendants used any information obtained from Mechanical to calculate the bid. By definition, a trade secret requires concealed information, a circumstance that did not exist in this case involving a public bid.

## V.
## CONCLUSION

{36} The mandatory sellback at $1 per share is unconscionable and therefore unenforceable. There is neither an enforceable buy back provision at fair market value nor any statutory basis upon which the Court could order a buy back based on the allegations in the counterclaims. The parties are left with Copeland and Gordon owning their Class Two stock on an unrestricted basis. Defendants are entitled to summary judgment on all plaintiff's claims.

So ordered this 3d day of December 2003.