Wachovia Ins. Servs., Inc. v. McGuirt, 2006 NCBC 23

NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
06 CVS 13593

WACHOVIA INSURANCE SERVICES,
INC. as survivor corporation of a merger
with CAMERON M. HARRIS & CO.,

Plaintiff,

v.

JOHN JACKSON MCGUIRT, JR., and
EDWARDS, CHURCH & MUSE, INC.,

Defendants.

ORDER

*Parker, Poe, Adams & Bernstein, L.L.P. by Deborah L. Edney and William L. Rikard, Jr. for Plaintiff Wachovia Insurance Services, Inc.*

*Rayburn, Cooper & Durham, P.A. by James B. Gatehouse and David S. Melin for Defendant John Jackson McGuirt, Jr.*

*Wyatt & Blake, L.L.P. by Robert A. Blake, Jr. and James F. Wyatt, III for Defendant Edwards, Church & Muse, Inc.*

Diaz, Judge.

{1}     The Court heard this matter on 8 September 2006 on the Motions of Defendants John Jackson McGuirt, Jr. ("McGuirt") and Edwards, Church & Muse, Inc. ("ECM") to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted.  For the reasons set forth below, and after considering the Complaint, the written Motions, counsels' memoranda and oral arguments, the Court **DENIES** the Motions.

# I.

## PROCEDURAL BACKGROUND

{2}     Wachovia Insurance Services, Inc. ("WIS") filed its Complaint ("Compl.") in Mecklenburg County Superior Court on 14 July 2006.

{3}     Pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6), McGuirt and ECM filed Motions to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted (respectively, "McGuirt Mot. to Dismiss" and "ECM Mot. to Dismiss") on 8 August 2006.

{4}     The case was transferred to the North Carolina Business Court and assigned to me as a mandatory complex business case by order of the Chief Justice of the North Carolina Supreme Court dated 9 August 2006.

{5}     On 30 August 2006, WIS filed a Memorandum in Opposition to the Motions to Dismiss ("Mem. in Opp'n to Mot. to Dismiss").

{6}     McGuirt and ECM filed a Reply Memorandum to WIS's Memorandum in Opposition to the Motions to Dismiss ("Reply Mem.") on 5 September 2006.

{7}     On 8 September 2006, the Court heard oral arguments on the Motions.

# II.

## THE FACTS[1]

### A.

## THE PARTIES

---

[1] On a motion to dismiss pursuant to Rule 12(b)(6), the complaint's material factual allegations are taken as true. *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 56, 554 S.E.2d 840, 844 (2001) (citing *Hyde v. Abbot Labs.*, 123 N.C. App. 572, 575, 473 S.E.2d 680-82 (1996)).  Consequently, the Court, in ruling on the Motions to Dismiss, considered only the facts alleged in the Complaint.

{8}     WIS is a North Carolina corporation doing business in Mecklenburg County, North Carolina.  (Compl. ¶ 1.)  WIS provides property-casualty insurance brokerage services, risk management consulting, employee benefits and compensation consulting, life insurance, and executive benefits to clients on a nationwide basis.  (Compl. ¶ 4.)

{9}     McGuirt is a resident of Mecklenburg County, North Carolina.  (Compl. ¶ 2.)  McGuirt is a former senior vice-president of WIS, (Compl. ¶ 9), and is currently employed by ECM (Compl. ¶ 20).

{10}    ECM is a North Carolina corporation with its principal place of business in Mecklenburg County, North Carolina.  (Compl. ¶ 3.)  ECM competes regularly with WIS for customers in the insurance brokerage business.  (Compl. ¶ 3.)

## B.

## THE PLAINTIFF'S CLAIMS

{11}    McGuirt was hired by Cameron M. Harris & Company ("CMH") on 26 March 1990 as a marketing underwriter.  (Compl. ¶ 5.)  He was promoted to producer on 29 August 1991. (Compl. ¶ 5.)

{12}    On 29 October 1991, McGuirt signed an employment agreement with CMH.  (Compl. ¶ 6.)  McGuirt signed an Amended and Restated Employment Agreement ("Amended Employment Agreement") with CMH on 1 January 1995.[2]  (Compl. ¶ 7.)

{13}    On 18 December 1998, McGuirt became a shareholder in CMH and executed a subscription agreement.  (Compl. ¶ 9.)

---

[2] The Amended Employment Agreement is attached to the Complaint and specifically incorporated into it, (*see* Compl. ¶ 9, Ex. 1), thus, the Court may properly consider it.  *See Eastway Wrecker Serv., Inc. v. City of Charlotte*, 165 N.C. App. 639, 641-42, 599 S.E.2d 410, 411-12 (2004); *Oberlin Capital* at 60-61, 554 S.E.2d at 847; *Robertson v. Boyd*, 88 N.C. App. 437, 440-41, 363 S.E.2d 672, 675 (1988).

{14} On 30 August 2002, PFAS, Inc. ("PFAS"), a wholly owned subsidiary of Wachovia Corporation ("Wachovia"), acquired all of the issued and outstanding shares of CMH's capital stock. (Compl. ¶ 1.) Immediately following the acquisition, PFAS caused CMH to merge with it. (Compl. ¶ 1.) CMH survived the merger, and the name of the merged corporation was changed to "Cameron M. Harris & Co." ("Cameron Harris"). (Compl. ¶ 1.) On 31 March 2005, Cameron Harris was merged into WIS.

{15} As a result of Wachovia's acquisition of CMH, McGuirt became employed as a senior vice-president of WIS. (Compl. ¶ 9.)

{16} As a senior vice-president, McGuirt: (a) had knowledge of WIS's trade secrets; (b) had knowledge of WIS's client base and business strategies; (c) participated in meetings with customers during which confidential information and trade secrets were discussed; (d) knew of WIS's strategic plans for competing in the marketplace; (e) was directly involved in developing the marketing strategy for WIS's insurance services; (f) took part in strategic and financial planning and development meetings concerning WIS's insurance business and services; (g) was involved in the pricing of WIS's services and knew how WIS's pricing of policies and other services enabled it to compete in the insurance marketplace; (h) was directly involved in the development of customer relationships on behalf of WIS; and (i) knew the strengths and weaknesses of WIS's customer relationships. (*See* Compl. ¶¶ 10, 35, 37, 41.)

{17} Further, McGuirt was aware of, and subject to, the Wachovia Code of Conduct. (Compl. ¶ 11.) The Wachovia Code of Conduct prohibits WIS employees, like McGuirt, from disclosing Wachovia's confidential information or using it "for any purpose other than the corporate purposes of Wachovia . . . ." (Compl. ¶ 11.)

{18} Finally, McGuirt remained subject to the Amended Employment Agreement and continued to act and perform under and pursuant to its terms. (Compl. ¶¶ 9, 23.)

{19} The Amended Employment Agreement defines McGuirt's "Post-Termination Restriction Period" as "the greater of (x) two (2) years after the termination of [McGuirt's] employment, for any reason . . . or (y) the Bonus/Alternate Bonus payment period as set forth in [McGuirt's] Commercial Lines Vesting Agreement if [McGuirt] shall upon termination of his employment then be entitled to receive any such payments . . . ." (Compl. Ex. 1 ¶ 6(a).)

{20} The Amended Employment Agreement further provides that, during the "Post-Termination Restriction Period," McGuirt will not:

> service, place, solicit, divert, take away, or attempt to service, place, solicit, divert, or take away any business, clients, customers or prospects of [WIS], and/or accounts he has been assigned or has developed for the placement of insurance or has in any way serviced at any time during the last two years of his employment with [WIS] . . . . provided, however, that [McGuirt] shall be allowed to sell, service and place insurance with those clients, customers, prospects, and accounts of [WIS] that were not clients, customers, prospects or accounts produced, assigned to or serviced by [McGuirt] in any way at any time during his last two years of employment with [WIS] and for whom he does not have knowledge of or possess [WIS's] proprietary and confidential information . . . .

(Compl. Ex. 1 ¶ 6(a)(i) (emphasis in original).)

{21} The Amended Employment Agreement also states:

> Notwithstanding anything contained herein or elsewhere to the contrary, each Employee agrees that to the extent that any customer, client, prospect or account of [WIS] leaves [WIS] at any time during the Post-Termination Restriction Period and transfers its business or coverage . . . to [McGuirt] or to any agency affiliated in any manner with [McGuirt], it shall be deemed conclusively proven that such customer, client, prospect or account was solicited by [McGuirt] in violation of the non-solicitation covenant . . . .

(Compl. Ex. 1 ¶ 6(b) (emphasis added).)

5

{22} The Amended Employment Agreement also prohibits McGuirt from soliciting and recruiting employees to leave WIS during the Post-Termination Restriction Period. (Compl. ¶ 14; Ex. 1 ¶ 9.)

{23} Finally, the Amended Employment Agreement prevents McGuirt, for a period of two years after the termination of his employment, from pirating or otherwise misappropriating WIS's confidential or proprietary information. (Compl. ¶ 15; Ex. 1 ¶ 7.)

{24} On 28 August 2002, McGuirt and WIS executed an Amendment to the Amended Employment Agreement (the "2002 Amendment") wherein the parties agreed to certain modifications of McGuirt's fringe benefits, but otherwise ratified and affirmed the terms of the Amended Employment Agreement. (Compl. ¶ 18.)

{25} On 10 April 2006, McGuirt downloaded over 1,000 documents from WIS's computer system onto a CD ROM (the "CD ROM"). (Compl. ¶ 20.)

{26} Nine days later, McGuirt resigned his employment with WIS. (Compl. ¶ 19.)

{27} Approximately one week after leaving WIS, McGuirt began work at ECM. (Compl. ¶ 20.) WIS alleges that McGuirt took the CD ROM with him to ECM. (Compl. ¶ 20.)

{28} On 25 April 2006, WIS wrote to McGuirt and ECM reminding them of McGuirt's obligations under the Amended Employment Agreement and the Wachovia Code of Conduct. (Compl. ¶ 21.)

{29} WIS also made several requests that McGuirt return all WIS information or documents in his possession. (Compl. ¶ 22.) Following WIS's fourth request, McGuirt acknowledged that he had taken the CD ROM. (Compl. ¶ 22.)

{30} On 28 April 2006, McGuirt contacted WIS regarding stock options that he claimed to be owed. (Compl. ¶ 25.)

6

{31} On 19 May 2006, Melanie Somers ("Somers"), a WIS Account Manager, resigned her position at WIS and immediately went to work for McGuirt and ECM. (Compl. ¶ 29.) WIS alleges that McGuirt, prior to his resignation from WIS, and in violation of his duties as a WIS senior vice-president, directly or indirectly solicited Somers to leave WIS and join him at ECM. (Compl. ¶ 30.)

{32} On 24 May 2006, WIS provided McGuirt with a Special Exit Benefit Letter (the "Exit Letter"). (Compl. ¶ 27; McGuirt Mot. to Dismiss Ex. A.)[3] Under the terms of the Exit Letter, WIS agreed to pay McGuirt $7,680.09 (less taxes and required deductions) in exchange for McGuirt's release of a variety of claims. (Compl. ¶ 27.)

{33} The first paragraph of the Exit Letter states that McGuirt and WIS "desire to terminate [McGuirt's] employment relationship amicably and definitively" and establishes 19 April 2006 as McGuirt's date of resignation or "Termination Date." (McGuirt Mot. to Dismiss Ex. A 1.)

{34} Paragraph four of the Exit Letter contains 14 subparagraphs delineating the specific terms of the proposed agreement. (McGuirt Mot. to Dismiss Ex. A 1-4.)

{35} Subparagraph 8 provides that McGuirt will not, for a period of two years from the Termination Date, "hire, solicit or encourage any employee of [WIS] to leave employment with [WIS]." (McGuirt Mot. to Dismiss Ex. A 3.)

{36} Subparagraph 11 of the Exit Letter states, "This letter agreement will take the place of all previous agreements between [McGuirt] and [WIS], and it contains the entire agreement between [the parties]. Neither [McGuirt] nor [WIS] will be bound by any statements or representations not contained in this letter agreement." (McGuirt Mot. to Dismiss Ex. A 3.)

---

[3] The Exit Letter is specifically referenced in the Complaint. (*See* Compl. ¶¶ 27-28.)

{37}    McGuirt signed the Exit Letter on 8 June 2006.  (McGuirt Mot. to Dismiss Ex. A 4.)

{38}    Pursuant to subparagraph 12 of the Exit Letter, the agreement became effective on 15 June 2006.  (McGuirt Mot. to Dismiss Ex. A 3-4.)

{39}    In June and July 2006, three WIS customers who McGuirt had worked with during his employment at WIS transferred their insurance business to ECM.  (Compl. ¶ 32.)  Account and customer information relating to two of the customers was on the CD ROM that McGuirt made on 10 April 2006.  (Compl. ¶ 32.)  WIS alleges that McGuirt has used WIS's confidential and proprietary information to solicit other WIS customers since his departure.  (Compl. ¶ 40.)

{40}    WIS also alleges that McGuirt has breached the Amended Employment Agreement because he is competing with WIS and soliciting WIS employees and customers.  (Compl. ¶¶ 49-55.)

{41}    WIS alleges further that ECM tortiously interfered with the Amended Employment Agreement by inducing McGuirt to terminate his employment with WIS.  (Compl. ¶¶ 96-101.)

{42}    On 8 August 2006, McGuirt moved to dismiss WIS's claim for breach of contract and "any of the other claims for relief [that] are premised on the [Amended Employment Agreement.]"  (McGuirt Mot. to Dismiss 1.)  That same day, ECM moved to dismiss WIS's claim for tortious interference with contract.  (ECM Mot. to Dismiss 1.)

### III.

### CONCLUSIONS OF LAW

{43}    The essential question on a Rule 12(b)(6) motion to dismiss is "'whether the complaint, when liberally construed, states a claim upon which relief can be granted on *any* theory.'" *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 56, 554 S.E.2d 840, 844 (2001) (quoting *Barnaby v. Boardman*, 70 N.C. App. 299, 302, 318 S.E.2d 907, 909 (1984)) (emphasis in

original).  A claim should not be dismissed under Rule 12(b)(6) "unless it affirmatively appears that plaintiff is entitled to no relief under any state of facts which could be presented in support of the claim."  *Ladd v. Estate of Kellenberger*, 314 N.C. 477, 481, 334 S.E.2d 751, 755 (1985) (quoting *Presnell v. Pell*, 298 N.C. 715, 719, 260 S.E.2d 611, 613 (1979)).

{44}   The Motions to Dismiss make three arguments for dismissing WIS's claims for breach of contract and tortious interference with contract.  First, McGuirt and ECM argue that the Amended Employment Agreement was superseded and replaced by the terms of the Exit Letter.  (McGuirt Mot. to Dismiss 8-14; ECM Mot. to Dismiss 2.)  Second, McGuirt and ECM argue that the Stock Purchase Agreement by which Wachovia acquired Cameron Harris constitutes a novation of the Amended Employment Agreement because it contains confidentiality, non-competition, and non-solicitation provisions that are inconsistent and incompatible with those found in the Amended Employment Agreement.  (McGuirt Mot. to Dismiss 14-17; ECM Mot. to Dismiss 2.)  Finally, McGuirt and ECM argue that the non-competition provisions of the Amended Employment Agreement are unenforceable on their face.  (McGuirt Mot. to Dismiss 17-22; ECM Mot. to Dismiss 2.)

{45}   The Court addresses each of these arguments in turn.

## A.

## THE EXIT LETTER

{46}   McGuirt and ECM first argue that WIS's claims for breach of contract and tortious interference with contract should be dismissed because the Amended Employment Agreement was superseded and replaced by the merger clause contained in subparagraph 11 of the Exit Letter ("subparagraph 11").  (McGuirt Mot. to Dismiss 8-14; ECM Mot. to Dismiss 2.)  The Court disagrees.

9

{47}    Under the facts alleged in the Complaint, determining whether subparagraph 11 superseded the Amended Employment Agreement would involve two fact-intensive inquiries, neither of which are appropriate when considering a Rule 12(b)(6) motion to dismiss. Furthermore, even if subparagraph 11 did supersede the Amended Employment Agreement, it did so only as of the Exit Letter's effective date, 15 June 2006, and, thus, would not bar WIS from prosecuting breaches of the Amended Employment Agreement that occurred before then.

{48}    "North Carolina recognizes that merger clauses are valid contractual provisions and the courts consistently uphold their use." *Mech. Sys. & Servs., Inc. v. Carolina Air Solutions, L.L.C.*, 2003 NCBC 9, at ¶ 25 (N.C. Super. Dec. 3, 2003) (citing *Zinn v. Walker*, 87 N.C. App. 325, 333, 361 S.E.2d 314, 318 (1987)).

{49}    The primary purpose of a merger clause is "to effectuate the policies of the Parol Evidence Rule; i.e., barring the admission of prior and contemporaneous negotiations on terms inconsistent with the terms of the writing." *Zinn v. Walker*, 87 N.C. App. 325, 333, 361 S.E.2d 314, 318 (1987).

{50}    However, "[w]here giving effect to the merger clause would frustrate and distort the parties' true intentions and understanding regarding the contract, the clause will not be enforced." *Id.*

{51}    In addition, a merger clause creates only "a rebuttable presumption that the writing represents the final agreement between the parties." *Id.* In order to effectively rebut the presumption, the claimant generally "must establish the existence of fraud, bad faith, unconscionability, negligent omission or mistake in fact." *Id.* (citing *Smith v. Cent. Soya of Athens, Inc.*, 604 F. Supp. 518, 526 (E.D.N.C. 1985)).

10

{52}    Determining whether subparagraph 11 superseded and replaced the Amended Employment Agreement would require the court to determine: (a) whether WIS and McGuirt intended such a result; and (b) whether McGuirt fraudulently induced WIS to enter into the Exit Letter by failing to disclose to WIS that he had already breached one of its provisions when he allegedly solicited Somers to leave WIS and accept employment with ECM.  Both of these fact-intensive inquiries are inappropriate when considering a Rule 12(b)(6) motion to dismiss.

{53}    The Complaint alleges that neither McGuirt nor WIS intended subparagraph 11 to supersede and replace the Amended Employment Agreement.  (Compl. ¶¶ 26-28.)  Since the Court will not enforce a merger clause where doing so "would frustrate and distort the parties' true intentions and understanding regarding the contract," *Zinn* at 333, 361 S.E.2d at 318, and is required to accept the Plaintiff's material factual allegations as true when considering a Rule 12(b)(6) motion, *see Oberlin Capital* at 56, 554 S.E.2d at 844, this allegation is alone sufficient to deny the Defendants' Motions to Dismiss.

{54}    The Complaint also alleges that McGuirt had already breached subparagraph 8 of the Exit Letter at the time he executed it, and that he failed to disclose this fact during the parties' negotiations.  (*See* Compl. ¶¶ 29-31; McGuirt Mot. to Dismiss Ex. A ¶ 8.)  Since application of a merger clause can be avoided on account of fraud, *Zinn* at 333, 361 S.E.2d at 318, this allegation provides a separate basis to deny the Defendants' Motions to Dismiss.

{55}    Furthermore, even if, as McGuirt and ECM argue, the language in subparagraph 8 of the Exit Letter is prospective, (*see* Reply Mem. 4-5), it incorporates the time period from McGuirt's termination on 19 April 2006 to the effective date of the Exit Letter, 15 June 2006. (*See* McGuirt Mot. to Dismiss Ex. A ¶ 8).  Consequently, WIS's allegation that Somers left WIS and started

11

work at ECM before the effective date of the Exit Letter, (*see* Compl. ¶ 29), supports WIS's claim that McGuirt knew he was in breach of the Exit Letter at the time he executed it.

{56}   Finally, even if subparagraph 11 did supersede the Amended Employment Agreement, it did so only as of the Exit Letter's effective date, 15 June 2006, (*see* McGuirt Mot. to Dismiss Ex. A), and, thus, would not bar WIS from prosecuting breaches of the Amended Employment Agreement that occurred before then.

{57}   The cases of *Rosania v. Rosania*, 108 N.C. App. 58, 422 S.E.2d 348 (1992), and *Hinshaw v. Wright*, 105 N.C. App. 158, 412 S.E.2d 138 (1992), cited by McGuirt and ECM in support of their argument, are inapposite. *Rosania* involved an incorporated comprehensive settlement agreement with a mutual release of all claims between former spouses. In that case, not only was there no doubt that the settlement agreement superseded and replaced all of the parties' prior agreements regarding their marital property, but the agreement was incorporated into a final judgment. Here, on the other hand, there are significant questions as to whether the Exit Letter superseded the Amended Employment Agreement. Regardless, the Exit Letter does not have the finality that accompanies an agreement incorporated into a judgment.

{58}   In *Hinshaw*, the court determined, as a matter of law, that a merger clause in an agreement superseded and replaced a prior agreement between the same parties. 105 N.C. App. at 163, 412 S.E.2d at 142. However, in *Hinshaw*, the court made this determination after a full evidentiary hearing. Here, in contrast, the issue of whether subparagraph 11 superseded the Amended Employment Agreement is before the Court on a Rule 12(b)(6) motion to dismiss. The findings necessary for a determination of this issue, while perhaps appropriate after a full evidentiary hearing, are not appropriate here.

{59}    In sum, the Court **DENIES** the Defendants' Motions to Dismiss WIS's claims for breach of contract and tortious interference with contract on the ground that the Amended Employment Agreement was superseded and replaced by subparagraph 11 of the Exit Letter because (a) the facts supporting such a conclusion are disputed; and, (b) even if Defendants are correct, WIS remains free to prosecute breaches of the Amended Employment Agreement that occurred before the Exit Letter's effective date.

**B.**

**THE STOCK PURCHASE AGREEMENT**

{60}    McGuirt and ECM next argue that the Stock Purchase Agreement constitutes a novation of the Amended Employment Agreement because it contains confidentiality, non-competition, and non-solicitation provisions that are incompatible with those found in the Amended Employment Agreement.  (McGuirt Mot. to Dismiss 14-17; ECM Mot. to Dismiss 2.)

{61}    For the reasons I explain below, however, the Court declines, at this time, to consider the legal effect, if any, of the Stock Purchase Agreement on the continued validity of the Amended Employment Agreement.

{62}    "When ruling on a Rule 12(b)(6) motion, a court may properly consider documents which are the subject of a plaintiff's complaint *and to which the complaint specifically refers* even though they are presented by the defendant."  *Oberlin Capital* at 60, 554 S.E.2d at 847 (citing *Robertson v. Boyd*, 88 N.C. App. 437, 441, 363 S.E.2d 672, 675 (1988)) (emphasis added).

{63}    In all other cases, however, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of

as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." N.C.G.S. § 1A-1, Rule 12(b) (2006).

{64} In this case, although the Complaint references generally the transactions by which Wachovia acquired CMH, (*see* Compl. ¶¶ 1, 9), it does not refer specifically to the Stock Purchase Agreement. Furthermore, none of the claims in the Complaint are premised on the Stock Purchase Agreement. (*See* Compl. ¶¶ 49-115.)

{65} Since a general reference to the stock purchase transaction, without more, does not allow me to consider the Stock Purchase Agreement without converting the Defendants' Rule 12(b)(6) Motions to Dismiss into Rule 56 motions for summary judgment, the Court declines, at this time, to consider the legal effect, if any, of the Stock Purchase Agreement on the continued validity of the Amended Employment Agreement.

{66} In any event, novation "of a contract may be effected only by acts or words wholly inconsistent with the material terms of the old contract[,]" *Zinn* at 335, 361 S.E.2d at 320 (citing 17 C.J.S. *Contracts* § 10 (1965) and 17 C.J.S. *Contracts* § 395 (1965)), and whether a novation occurred "depends upon [the parties'] intention as ascertained from the instrument, the relation of the parties and the surrounding circumstances." *Id.* (citing *Tomberlin v. Long*, 250 N.C. 640, 109 S.E.2d 365 (1959)). Further, a novation must be proven by clear and convincing evidence. *Id.* at 337, 361 S.E.2d at 320-21.

{67} For reasons I have discussed earlier, the Court declines to discern the intent of the parties as to whether a novation occurred here because such a fact-intensive inquiry is inappropriate on a Rule 12(b)(6) motion to dismiss.

{68} If pressed, however, I would find that the Stock Purchase Agreement is at least ambiguous as to whether it was intended to replace the Amended Employment Agreement, and I

certainly would not find that the facts before me clearly and convincingly favor the Defendants' position.

{69} In sum, the Court **DENIES** the Defendants' Motions to Dismiss WIS's claims for breach of contract and tortious interference with contract on the ground that the Stock Purchase Agreement constitutes a novation of the Amended Employment Agreement because the Stock Purchase Agreement is not properly before me. Even if the Court could consider the Stock Purchase Agreement, I still would not dismiss WIS's claims because the fact-intensive inquiry necessary to find a novation is inappropriate at this stage and the undisputed facts do not support such a result.

## C.

## THE AMENDED EMPLOYMENT AGREEMENT

{70} Finally, McGuirt and ECM argue that the non-competition provisions of the Amended Employment Agreement are unenforceable on their face because they place unreasonable time and geographic restrictions on McGuirt's employment. (McGuirt Mot. to Dismiss 17-22; ECM Mot. to Dismiss 2.) The Court agrees in part, but declines to dismiss the claims.

## 1.

## APPLICABLE LAW

{71} In North Carolina, covenants not to compete "between an employer and employee are valid and enforceable if they are (1) in writing; (2) made part of a contract of employment; (3) based on valuable consideration; (4) reasonable both as to time and territory; and (5) not against public policy." *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 649-50, 370 S.E.2d 375, 380 (1988) (citing *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 302 S.E.2d 754 (1983)).

15

{72}     "In evaluating the reasonableness of [a] time and territory restriction, [North Carolina courts] consider each element in tandem and not independently." *Wade S. Dunbar Ins. Agency, Inc. v. Barber*, 147 N.C. App. 463, 469, 556 S.E.2d 331, 335 (2001) (citing *Hartman v. W.H. Odell and Assoc., Inc.*, 117 N.C. App. 307, 311-12, 450 S.E.2d 912, 916 (1994)).

{73}     North Carolina courts have upheld covenants not to compete that last for two years and use customer-based restrictions instead of territorial restrictions. *E.g., Triangle Leasing Co. v. McMahon,* 327 N.C. 224, 393 S.E.2d 854 (1990); *Wade S. Dunbar,* at 469, 556 S.E.2d at 335-36. However, a "five-year time restriction is the outer boundary which our courts have considered reasonable, and even so, five-year restrictions are not favored." *Farr Assocs., Inc., v. Baskin*, 138 N.C. App. 276, 280, 530 S.E.2d 878, 881 (2000).

{74}     Moreover, "when a non-compete agreement reaches back to include clients of the employer during some period in the past, that look-back period must be added to the restrictive period to determine the real scope of the time limitation." *Id.* at 280-81, 530 S.E.2d at 881 (citing *Prof'l Liab. Consultants, Inc. v. Todd*, 345 N.C. 176, 478 S.E.2d 201 (1996)).

{75}     At all events, the employer must show that the territory embraced by the covenant is no broader than necessary to secure the protection of its business or good will. *See, e.g., Farr* at 281, 530 S.E.2d at 882 (citing *AEP Indus., Inc. v. McClure*, 308 N.C. 393, 404, 302 S.E.2d 754, 761 (1983)).[4]  And, if the parties choose a client-based limitation to define the territorial reach of

---

[4] Our Court of Appeals has enumerated six factors relevant to the determination of reasonableness:

> (1) the area, or scope, of the restriction; (2) the area assigned to the employee; (3) the area where the employee actually worked or was subject to work; (4) the area in which the employer operated; (5) the nature of the business involved; and (6) the nature of the employee's duty and his knowledge of the employer's business operation.

*Hartman v. W.H. Odell & Assocs., Inc.,* 117 N.C. App. 307, 312, 450 S.E.2d 912, 917 (1994) (citing *Clyde Rudd & Assocs., Inc. v. Taylor*, 29 N.C. App. 679, 684, 225 S.E.2d 602, 605 (1976)).  As McGuirt concedes, (*see* McGuirt Mot. to Dismiss 20 n.10), the Court may not, at this stage, engage in the fact-intensive review required to properly analyze these factors.

the covenant, the "limitation cannot extend beyond contacts made during the period of the employee's employment." *Id.* at 282, 530 S.E.2d at 883.

## 2.

## ANALYSIS

{76}   In this case, the non-compete covenant defines McGuirt's "Post-Termination Restriction Period" as "the greater of (x) two (2) years after the termination of [McGuirt's] employment, for any reason . . . or (y) the Bonus/Alternate Bonus payment period as set forth in [McGuirt's] Commercial Lines Vesting Agreement if [McGuirt] shall upon termination of his employment then be entitled to receive any such payments . . . ."  (Compl. Ex. 1 ¶ 6(a).)

{77}   The covenant provides further that, during the "Post-Termination Restriction Period," McGuirt will not:

> service, place, solicit, divert, take away, or attempt to service, place, solicit, divert, or take away any business, clients, customers or prospects of [WIS], and/or accounts he has been assigned or has developed for the placement of insurance or has in any way serviced at any time during the last two years of his employment with [WIS] . . . .  provided, however, that [McGuirt] shall be allowed to sell, service and place insurance with those clients, customers, prospects, and accounts of [WIS] that were not clients, customers, prospects or accounts produced, assigned to or serviced by [McGuirt] in any way at any time during his last two years of employment with [WIS] and for whom he does not have knowledge of or possess [WIS's] proprietary and confidential information . . . .

(Compl. ¶ 12; Ex. 1 ¶ 6(a)(i) (emphasis in original).)

{78}   The covenant also states:

> [T]o the extent that any customer, client, prospect or account of [WIS] leaves [WIS] at any time during the Post-Termination Restriction Period and transfers its business or coverage . . . to [McGuirt] or to any agency affiliated in any manner with [McGuirt], it shall be deemed conclusively proven that such customer, client, prospect or account was solicited by [McGuirt] in violation of the non-solicitation covenant . . . .

(Compl. ¶ 10; Ex. 1 ¶ 6(b) (emphasis added).)

17

{79} Construing these provisions in light of the facts alleged in the Complaint, the Court arrives at the following legal conclusions.

{80} First, the covenant contains a reasonable time restriction of two years. Contrary to the Defendants' argument, (*see* McGuirt Mot. to Dismiss 18-19; ECM Mot. to Dismiss 2), the portion of the covenant that prevents McGuirt from servicing accounts that "he has been assigned or has developed for the placement of insurance or has in any way serviced at any time during the last two years of his employment with [WIS]," (Compl. Ex. 1 ¶ 6(a)(i)), is not a "look back" period that adds to the length of the restriction.

{81} Unlike the "look back" provision in *Farr,* the language here does not attempt to bring within its ambit all of WIS's clients within the two years preceding McGuirt's termination. Rather, the covenant is tailored to capture only those clients whom McGuirt worked with during the two years preceding his termination. At least at this stage, I conclude that this language is a reasonable method of defining the covenant's client-based restrictions.

{82} In any event, even if I determined that the covenant incorporates a two-year "look back" period, the resulting four-year term is within the period defined by our appellate courts as the outer limit of enforceability. *See Eng'g Assocs., Inc. v. Pankow*, 268 N.C. 137, 139, 150 S.E.2d 56, 58 (1966) (stating that a five-year restrictive covenant might be held to be reasonable in some circumstances).

{83} Second, while McGuirt insists that the term of the covenant is potentially as long as six years and sixty days, (*see* McGuirt Mot. to Dismiss 18), this argument is premised on the Court's consideration of a document that is not properly before me. More specifically, McGuirt argues that the calculation of the "Bonus/Alternate Bonus payment period" set out in the covenant produces a term of four years and sixty days, which, when added to the two-year "look back"

18

period, contemplates a covenant well outside the five-year boundary. (McGuirt Mot. to Dismiss 18.)

{84}  McGuirt's calculation, however, begins with a document identified in the covenant as the "Employee's Commercial Lines Vesting Agreement." (McGuirt Mot. to Dismiss 18-19.) As was the case with the Stock Purchase Agreement, however, Plaintiff did not specifically reference this document in the Complaint, nor was it tendered to the Court. Accordingly, I decline to consider this argument.

{85}  Third, contrary to the Defendants' argument, a covenant's use of a client-based restriction in lieu of specific territorial restrictions, in combination with a two-year restrictive period, has been accepted under North Carolina law. *See, e.g., Triangle Leasing Co.* at 229-30, 393 S.E.2d at 858; *Wade S. Dunbar* at 469, 556 S.E.2d at 335-36. In this case, however, the Court agrees with the Defendants that the language used in the covenant to achieve this end works instead to achieve an unreasonable effect. (McGuirt Mot. to Dismiss 19-20.)

{86}  The Court finds that paragraph 6(a)(i) of the covenant is consistent with *Farr* and, therefore, reasonable because it contains a carve-out clause allowing McGuirt to solicit WIS clients, customers, or accounts with whom he had no contact or relationship during the last two years of his employment. (*See* Compl. Ex. 1 ¶ 6(a)(i).)

{87}  Paragraph 6(b) of the covenant, however, inconsistently and unreasonably expands the scope of the previous limiting clause by imposing a conclusive presumption deeming McGuirt to have violated the terms of the covenant if *any* WIS client, regardless of McGuirt's contact or relationship with that client, leaves WIS in favor of McGuirt's new employer. (*See* Compl. Ex. 1 ¶ 6(b).)

19

{88} Nothing more appearing, the Court would hold that this unreasonably broad provision renders the entire covenant unenforceable. Indeed, the general rule is that "if the territory [of a non-compete agreement] is too broad, 'the entire covenant fails since equity will neither enforce nor reform an overreaching and unreasonable covenant.'" *Hartman v. Odell & Assoc.*, Inc., 117 N.C. App. 307, 312, 450 S.E.2d 912, 917 (1994) (quoting *Beasley v. Banks*, 90 N.C. App. 458, 460, 368 S.E.2d 885, 886 (1988)); s*ee also CNC/Access, Inc. v. Scruggs,* 2006 NCBC 20, at ¶¶ 42-55 (N.C. Super. Nov. 17, 2006).

{89} The facts of this case, however, prove the exception. More specifically, while "North Carolina's 'blue pencil' rule severely limits what the court may do to alter [an unenforceable] covenant . . . [a] court . . . may choose not to enforce a distinctly separable part of a covenant in order to render the provision reasonable." *Hartman* at 317, 450 S.E.2d at 920. Such is the case here, as the Court finds that it may excise the overly broad language of paragraph 6(b) of the covenant, while giving effect to the remaining terms.

{90} In sum, the Court finds that, with one exception, the non-competition provisions of the Amended Employment Agreement, when considered in tandem, are reasonable under North Carolina law. The Court also finds that it may excise the otherwise unreasonable term contained in paragraph 6(b) of the covenant and enforce the remainder. Accordingly, the Court declines to grant the Defendants' Motions to Dismiss on this ground.

## CONCLUSION

{91} Based on the foregoing, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the Defendants' Motions to Dismiss are **DENIED**.

This the 19th day of December, 2006.